Argued and submitted March 11, affirmed on appeal; reversed and remanded in part and affirmed in part on cross-appeal October 9, 1996, petition for review allowed June 17, 1997 (325 Or _____ )

John LAKIN
and Ann Marie Lakin,
husband and wife,
*Respondents - Cross-Appellants,*

*v.*

SENCO PRODUCTS, INC.,
an Ohio corporation,
*Appellant - Cross-Respondent,*
*and*

WESTERN SUPPLY CORPORATION,
an Oregon corporation,
dba Western Tool Supply,
*Defendant.*

(9211-07901; CA A83575)

925 P2d 107

William L. Hallmark and Lindsey H. Hughes argued the cause for appellant - cross-respondent. With them on the briefs was Hallmark, Keating & Abbott, P.C.

Kathryn H. Clarke and William A. Gaylord argued the cause for respondents - cross-appellants. With them on the briefs were Maureen Leonard and Larry Dawson.

Before Riggs, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Defendant Senco Products, Inc., appeals from a judgment awarding plaintiffs John and Ann Marie Lakin compensatory and punitive damages, following a jury trial on product liability and loss of consortium claims. Those claims arose from an incident in which John Lakin was severely injured while using a nail gun that defendant manufactured and sold. Defendant raises 17 assignments of error pertaining, *inter alia*, to the trial court's denial of a directed verdict on liability, the sufficiency of plaintiffs' proof of entitlement to punitive damages, and the alleged excessiveness of the punitive damage award. Plaintiffs cross-appeal, challenging the trial court's application of the statutory "cap" on recovery of noneconomic damages, ORS 18.560, and the trial court's reduction of Ann Marie Lakin's recovery for loss of consortium, based on her husband's comparative fault in the underlying accident. We affirm on the appeal, and affirm in part and reverse in part on the cross-appeal.

Viewed most favorably to plaintiffs, *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984), the record discloses the following facts material to compensatory liability:[1] Senco manufactures and markets a variety of pneumatic nail guns and staplers, including the SN325 nail gun, which discharges 3.25-inch nails. The SN325 will discharge a nail only if two trigger mechanisms are concurrently activated; that is, the user must both (1) squeeze the nail gun's finger trigger and (2) press the nail gun's muzzle against a surface, activating the bottom trigger or safety. The SN325 may be used in either of two ways. In the first, called "bump fire" or "bounce fire," the operator drives nails in rapid succession— at a rate of up to nine nails per second—by keeping the finger trigger continuously depressed and bouncing the gun along the work surface, constantly reactivating the muzzle safety/ trigger. In the second method, known as "place fire," the operator first presses the safety against the work surface, and then pulls the finger trigger to drive the nail.

---

[1] Facts pertaining to plaintiffs' entitlement to punitive damages and the amount of such damages are set forth below. *See* 144 Or App at 72-74.

On December 1, 1990, John Lakin was helping to build a new home for his mother-in-law. Lakin, who had previously used Senco nail guns, including the SN325, borrowed an SN325 from Reichow, another worker on the site. In attempting to nail two-by-fours under the eaves of the garage, Lakin stood on tiptoe on a makeshift platform mounted on two saw horses and raised a two-by-four over his head. Holding the board in position with his left hand and with the nail gun in his right hand, he pressed the nose of the SN325 up against the board, depressing the safety, and pulled the finger trigger so as to "place fire" a nail into the board.

The gun fired a first nail and then, in a phenomenon known as "double firing," immediately discharged an unintended second nail that struck the first nail. The gun then recoiled violently backward toward Lakin and, with Lakin's finger still on the trigger, the gun came into contact with his cheek. That contact activated the safety, causing the gun to "bump fire" a third nail through Lakin's cheek bone and into his brain.

The nail penetrated the frontal lobe of the right hemisphere of Lakin's brain, blocked a major artery, and caused extensive tissue damage. Lakin was unconscious for several days and, ultimately, underwent multiple surgeries. He suffers permanent brain damage, including a condition known as "left neglect syndrome" in which he is unable to perceive information from the left hemisphere of his brain and suffers partial paralysis of the left side of his body. Because of his cognitive impairment, which affects his short-term memory and ability to assess spatial relationships, Lakin is unable to obtain gainful employment. He has also undergone a radical personality change and is prone to violent outbursts. His previously warm and loving relationship with his wife and four children has been permanently altered. After a brief attempt to live with his family, plaintiff found that he was unable to do so and, at the time of trial, lived in a supervised group home for brain-injured persons. His treating doctors and counselors believe that he will never again be able to live independently.

In November 1992, plaintiffs filed this action, alleging claims for personal injury, sounding in strict liability and negligence, and loss of consortium. Plaintiffs' operative third amended complaint alleged that the SN325 was dangerously defective both because its design permitted "double fire" and inadvertent "bump fire" and because the warnings accompanying the product were inadequate, in that they failed, *inter alia*, to sufficiently warn of the potential risks of "double firing" and inadvertent "bump firing" and failed to inform users of the availability of a "restrictive trigger version" of the SN325, which would "eliminate the risks of unintended double fire and unintended firing on contact with a person." The complaint also alleged a negligence count, which generally tracked the allegations of the strict liability count, and which further pleaded that defendant was negligent in failing to test the SN325 adequately.[2] Finally, the complaint alleged, on Ann Marie Lakin's behalf, a claim for loss of consortium. John Lakin sought economic damages of approximately $4,200,000, and noneconomic damages of $4,000,000 for his injuries. Ann Marie Lakin sought noneconomic damages of $1,000,000 for loss of consortium. Both plaintiffs, jointly, sought punitive damages of $7.5 million.

Senco's answer alleged a variety of affirmative defenses, including, as material to this appeal: (1) John Lakin's injuries were the product of comparative fault, product misuse, and/or product alteration; (2) the noneconomic damages "cap" of ORS 18.560 limited plaintiffs' total recovery of such damages (including on the loss of consortium claim) to $500,000; and (3) any recovery of punitive damages would violate the United States and Oregon Constitutions.

After a 17-day trial, the court submitted plaintiffs' claims in their entirety to the jury, along with defendant's

---

[2] The complaint alleged that Senco was negligent

"[i]n failing to conduct any test, experiment, calculation or research reasonably likely to discover the frequency of unintended double fire incidents among foreseeable users of the SN325, or the potential forces of recoil affecting the operator's ability to control the gun following an unintended double fire, or the abilities of operators to release the finger trigger after a single firing in order to prevent double fire, or the abilities of operators to avoid accidental contact with the contact trigger after loss of control of the gun due to double fire."

defenses of comparative fault, product misuse, product alteration, and assumption of the risk. The jury returned a special verdict, finding defendant liable both in strict liability and in negligence and fixing John Lakin's comparative fault at five percent. The jury awarded John Lakin $3,323,413 in economic damages, and $2,000,000 in noneconomic damages, and awarded Ann Marie Lakin $876,000 in noneconomic damages for loss of consortium. Finally, the jury found that defendant had acted with "wanton disregard for the health, safety, and welfare of others" in causing plaintiffs' injuries and awarded punitive damages of $4,000,000.

Thereafter, and over plaintiffs' objections, the trial court entered a judgment that reduced the jury's awards of noneconomic damages to conform to the $500,000 statutory "cap" and further reduced plaintiffs' compensatory damages, including Ann Marie Lakin's loss of consortium recovery, by John Lakin's five percent comparative fault. Thus, the judgment awarded:

"NONECONOMIC DAMAGES IN FAVOR OF JOHN LAKIN: ($500,000 per ORS 18.560 less 5%) $475,000.00

"ECONOMIC DAMAGES IN FAVOR OF JOHN LAKIN: ($3,323,413.00 less 5%) $3,157,242.40

"LOSS OF CONSORTIUM DAMAGES IN FAVOR OF ANN MARIE LAKIN: ($500,000.00 per ORS 18.560 less 5%) $475,000.00

"PUNITIVE DAMAGES IN FAVOR OF JOHN LAKIN AND ANN MARIE LAKIN JOINTLY: $4,000,000.00"

Defendant subsequently moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, asserting, in part, that plaintiffs' proof was insufficient to establish entitlement to punitive damages; that any award of punitive damages was unconstitutional; and that, in all events, the jury's award was unconstitutionally excessive. The court denied those motions.

Defendants' appeal raises 17 assignments of error. Plaintiffs' cross-appeal, which pertains to the trial court's reduction of the jury's awards, raises three assignments of error. Despite that multiplicity, the parties' assignments fall

into five general groups. For clarity, we group, and successively consider, assignments of error pertaining to: compensatory liability; entitlement to punitive damages; "excessiveness" of punitive damages; application of ORS 18.560; and loss of consortium/comparative fault.

## COMPENSATORY LIABILITY

Defendant's first seven assignments of error challenge rulings denying a directed verdict, admitting or excluding evidence, and giving or refusing to give instructions, all of which pertained to Senco's compensatory liability.

Defendant first assigns error to the denial of its motion for a directed verdict against plaintiffs' failure to warn allegations.[3] Defendant does not contend that the SN325's labeling or accompanying materials adequately warned of the danger of double firing or unintentional "bump fire" activation. Instead, defendant asserts that plaintiffs failed to prove that John Lakin actually read the product labeling or materials and that, without such proof, plaintiffs' proof of causation was insufficient as a matter of law:

> "Absent evidence that [plaintiff] actually read the warnings, no issue of fact exists as to whether or not a different warning would have changed his conduct. As a result there is no causal relationship between the warnings provided by Senco and plaintiff's injuries, as a matter of law.
>
> "* * * * *
>
> "[P]laintiff admitted he did not read the warnings affixed to the nail gun, in the manual, or on the packaging that came with the nails or the SN325. On this record the evidence showed no possibility that a difference in the warnings could have changed plaintiff's conduct, and there was no evidence to establish that if the warnings had in fact been

---

[3] As noted above, the court submitted plaintiffs' design defect, inadequate testing, and failure to warn specifications to the jury. Defendant unsuccessfully moved for a directed verdict against all of those allegations but, on appeal, does not dispute the sufficiency of plaintiffs' proof of design defect or inadequate testing. Instead, invoking *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 788 P2d 428 (1990), defendant argues that, because plaintiffs' proof pertaining to failure to warn was legally insufficient and because the jury returned a general verdict on plaintiffs' strict liability and negligence claims, *Whinston*'s "we can't tell" principle, 309 Or at 357-59, compels reversal.

different plaintiff would have behaved in a different manner. Plaintiff's claim was wholly lacking in causation."

Plaintiffs counter with two responses, one factual, and one legal. First, they assert that there was evidence from which the jury could reasonably conclude that John Lakin did, in fact, read the SN325 operator's manual, including on the day of the accident. Second, as a matter of law, regardless of whether Lakin actually read the product labeling and materials, a plaintiff's failure to read instructions precludes liability only if the instructions were adequate. We agree with plaintiffs' first argument and, consequently, do not reach the second.[4]

Viewing the evidence and reasonable collateral inferences in the light most favorable to plaintiffs, *Brown*, 297 Or at 705, we conclude that there was evidence from which the jury could have found that John Lakin read the warnings in the SN325 manual.[5] Lakin testified that, on the day of the accident, he had borrowed the manual for the SN325 from Reichow and had "looked at" that manual. The following "safety warning" appeared at page 5 of that manual:

---

[4] The parties cite conflicting authority from other jurisdictions concerning the legal/causative impact of a plaintiff's failure to read inadequate warnings. *Compare, e.g., Powell v. Harsco Corp.*, 209 Ga App 348, 433 SE2d 608, 610 (1993) and *J & W Enterprises, Inc. v. Economy Sales, Inc.*, 486 NW2d 179, 181 (Minn App 1992) (both holding that plaintiffs' failure to read actual warnings barred recovery on "failure to warn" theory because adequate warnings would not have altered plaintiff's conduct) *with Champs Conv. Stores v. United Chemical*, 329 NC 446, 406 SE2d 856 (1991) (plaintiff's failure to read instructions is a defense only if the instructions were adequate) and *Muncy v. Magnolia Chemical Co*, 437 SW2d 15, 19 (Tex Civ App 1969) ("[A] manufacturer of a dangerous product could not avoid liability for injury caused by the product where the warning was insufficient, although the user admitted he had not read the label."). *Accord Bartlett v. MacRae*, 54 Or App 516, 518-19, 635 P2d 666 (1981) (concluding that "[t]here was no substantial evidence that any alleged labeling deficiencies were the proximate cause" of the decedent's injuries, where the decedent mistook a plastic jug containing cattle dye for his water jug, despite the fact that the dark-colored dye was clearly visible and the container was clearly labeled).

[5] Defendant urges us to "view the evidence based on the applicable, substantive evidentiary burden and ask if, based upon the evidence, a reasonable jury could have found for the nonmoving party by a preponderance of the evidence." That misapprehends our role in reviewing the sufficiency of evidence supporting a jury's determination of compensatory liability. We do not weigh or assess such evidence against the "substantive evidentiary burden" but, instead, must affirm such determinations unless we "can affirmatively say that there is no evidence to support the verdict." Or Const, Art VII (Amended), § 3; *see generally Wagner v. Kaiser Foundation Hospitals*, 285 Or 81, 83-84, 589 P2d 1106 (1979).

> "Hold tool firmly to minimize recoil. Recoil can result in a second fastener being driven unintentionally."

Plaintiff contends, and Senco does not argue otherwise, that the instruction was erroneous in that it is not the proper way to prevent or reduce double fire. Experts at trial testified that, by holding the nail gun firmly against the surface, the user actually increases the risk of double fire. The correct way to avoid the potential of double fire is to allow the gun to pull back from the work surface.

Lakin, who suffered cognitive difficulties and memory loss following the accident, testified that Reichow read to him from the manual at lunch on the day of the accident. Lakin specifically recalled "a picture of someone standing on an aluminum ladder [with] a circle with a line through it saying do not use it."[6] That picture and warning appeared on page 6 of the SN325 manual, which was immediately and visually adjacent to page 5, on which the anti-recoil "safety warning" appeared.

From John Lakin's testimony, the jury could conclude that Lakin did, in fact, read, or hear someone else read, the anti-recoil instruction. The jury could reasonably infer from the fact that Lakin knew of the warning on page 6 of the SN325 manual that he also knew of the inadequate warnings/instructions on the preceding page. *See Fugate v. Safeway Stores, Inc.*, 135 Or App 168, 171, 897 P2d 328 (1995) (although a jury may not reach a verdict solely through speculation or guess work, "it must be able to 'apply the ordinary experience of mankind' to the facts and draw reasonable inferences" (quoting *Law v. Kemp*, 276 Or 581, 585-86, 556 P2d 109 (1976)). The common-sense reasonableness of that inference is buttressed by plaintiffs' proof that, at the time of the accident, John Lakin was acting in conformity with the defective instruction, *i.e.*, that he held the SN325 firmly against the two-by-four in an effort to minimize recoil. That, in turn, contributed to the double fire and ensuing violent

---

[6] Reichow testified, contrary to Lakin's testimony, that the operator's manual for the SN325 was not at the job site and, although he recalled having lunch with Lakin, Reichow denied having read the manual to him.

recoil. The court properly refused to direct a verdict against plaintiffs' failure to warn specifications.

Defendant's second and third assignments of error challenge the trial court's admission of evidence regarding other alleged injuries attributable to Senco tools. Plaintiffs offered the testimony of Senco's general counsel, Muto, that he was aware of four to eight allegations per year of injury resulting from unintended "bump fire" actuation of Senco nail guns or staple guns. Plaintiffs also offered testimony by Sevart, an expert in controls engineering, that he was aware of many other instances in which users of Senco products had been injured in incidents involving *either* "double fire" or inadvertent "bump fire" actuation. Neither Muto nor Sevart testified about incidents involving a combination of *both* "double fire" and inadvertent "bump fire." The court admitted the Muto and Sevart testimony over defendant's objection that plaintiffs had failed to establish sufficient similarity between the alleged incidents described in that testimony and the accident at issue in this case.

Although evidence of prior similar occurrences is not admissible to prove a specific act of negligence, such evidence is admissible

> "to prove the existence of a continuing defect or a continuing course of negligent conduct, and that the condition or course of conduct is in fact dangerous, or that the defendant had notice of its dangerous character. The admissibility of such evidence for these purposes is, however, subject to the requirement that the prior accidents must have occurred under similar conditions and circumstances.
>
> "\* \* \* \* \*
>
> "Only substantial similarity, not complete identity of circumstances, is required. What elements must be similar will depend, of course, on the nature of the allegedly dangerous condition in each case." *Rader v. Gibbons and Reed Company*, 261 Or 354, 359-60, 494 P2d 412 (1972) (citation omitted).

Trial courts have broad discretion in assessing "substantial similarity," and we review such determinations for abuse of discretion. *Davis v. Homasote Co.*, 281 Or 383, 387-88, 574

P2d 1116 (1978);[7] *see generally Dyer v. R. E. Christiansen Trucking, Inc.*, 318 Or 391, 400-01, 868 P2d 1325 (1994) (discussing trial court's authority to determine the relevancy, under OEC 401, and admissibility, under OEC 402, of a videotape purporting to depict circumstances similar to those giving rise to the plaintiff's injury).

On appeal, defendant argues that the trial court abused its discretion in admitting Muto's and Sevart's testimony:

> "Plaintiffs claimed [Lakin's] accident was the result of a 'double fire' and a resulting recoil. Nothing about Muto's testimony showed similar circumstances to be a basis for any of the four to eight claims of injury each year. Viewing the evidence in plaintiffs' favor, the circumstances of [Lakin's] injury in this case, including the manner the nail gun was used, the temporary scaffolding, plaintiff's posture, and the proximity of the nail gun to plaintiff's head and body, were unique. Muto's testimony, admitted over defendant's objection, was merely about allegations of unintended actuation from Senco's *entire* product line of nailers and staplers, comprised of many different tools and intended for many different applications and purposes. Plaintiffs failed to show any similarity in the tools involved, let alone in the circumstances and manner of use." (Emphasis in original.)

In response, plaintiffs first argue that, in order to be admissible, evidence of other injuries need only be "substantially similar," not identical, to the circumstances that caused John Lakin's injury. They further argue that the trial court has a

---

[7] In *Carter v. Moberly*, 263 Or 193, 501 P2d 1276 (1976), the court described the contours of a trial court's discretion in determining whether evidence of a defendant's conduct was too "remote":

"Its exercise requires the judge to weigh the value of the evidence in light of all the circumstances of the particular case, and his conclusion, if it is reasonable, will not be disturbed on appeal. Precedent is of little value in reviewing such cases, because even when cases involve similar issues and similar types of evidence, the other factors which may properly influence the trial court's ruling are highly variable. We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether his ruling was the only one possible. It may be that the record will support either admission or exclusion; if so, the trial court's ruling will be affirmed, regardless of which solution we would prefer." 263 Or at 200-01 (footnote omitted).

broader range of discretion in admitting evidence of prior incidents where, as here, such evidence is introduced to prove notice to defendants of a product's risk, not its inherent dangerousness. *See, e.g., Shields v. Sturm, Ruger & Co.*, 864 F2d 379, 381 (5th Cir 1989); *Exum v. General Elec. Co.*, 819 F2d 1158, 1163 (DC Cir 1987).

■ We agree with plaintiffs that the Muto and Sevart testimony met the "substantial similarity" test. The standard is one of substantial similarity, not identity. *Rader*, 261 Or at 360. Although defendant may well be correct that the accident here was "unique" in certain particulars, the "double fire" and unintended "bump fire" that, in combination, caused John Lakin's injury were not. Indeed, according to Muto and Sevart, defendant had notice of dozens of incidents in which users of Senco products had allegedly been injured as a result of either of those phenomena. That similarity was sufficiently "substantial" to render the "prior claims" evidence admissible as relevant to the issue of defendant's notice of product dangerousness. *See Oberg v. Honda Motor Co.*, 316 Or 263, 267-69, 851 P2d 1084 (1993), *rev'd on other grounds* 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994) (affirming trial court's admission of "other claims" evidence as relevant to notice of product dangerousness; rejecting defendant's argument that evidence did not demonstrate "substantial similarity" of vehicles involved or circumstances of prior accidents).[8] The fact that plaintiffs' "prior claims" evidence pertained to unproven allegations went to its weight, rather than to its admissibility, as does the fact that that testimony pertained to Senco nail guns and staplers in general, rather than solely to the SN325. Finally, we conclude, without further discussion, that the trial court did not err in determining that the probative value of the "prior claims" evidence "was not substantially outweighed by the danger of unfair prejudice" to defendant. OEC 403.

Defendant's fourth and fifth assignments of error challenge the trial court's refusal to give two jury instructions pertaining to defendant's allegation that, at the time of the accident, John Lakin or someone else had tied back the

---

[8] *But see Oberg*, 316 Or at 289-316 (Peterson, J., dissenting) (addressing "substantial similarity" issue at length).

SN325's muzzle safety. The first, Uniform Civil Jury Instruction 12.01, provides:

> "In evaluating the evidence, you may consider the power of each side to produce evidence. If weaker and less satisfactory evidence is offered by either party when it appears to you that stronger and more satisfactory evidence was within the power of the party to produce, the evidence offered should be viewed with mistrust."[9]

The second instruction provided:

> "The sawhorses, platform, ladder, and the negatives of the photographs taken by John Reichow were all in plaintiffs' possession or control prior to bringing this lawsuit. Because plaintiffs had the power to produce these items, and cannot do so because the items were lost or destroyed, you should presume that this evidence was harmful to plaintiff's claim."

Those instructions related to defendant's assertion that the "double firing" that precipitated the accident occurred because John Lakin, or some third person, had tied back the SN325's muzzle safety, circumventing that mechanism.[10] One of defendant's witnesses, Waliezer, who arrived at the scene immediately after the accident, testified that the safety was fastened back in some way. Defendant also offered a computer analysis of some pictures Reichow took at the accident scene, which, its experts asserted, showed that the safety had been tied back. Conversely, plaintiffs presented Reichow's testimony that he had not tied back the safety and that, when he recovered the SN325 after the accident, its safety had not been disabled. Plaintiffs also adduced evidence that the SN325's safety mechanism "looked wired back," even when the safety has not been disabled or altered. Finally, plaintiffs' experts, analyzing the same photographic blow ups that defendant's experts analyzed, opined that the "wire" or "thread" that defendant's experts identified was, in fact, a photographic artifact resulting from the coloring chemicals in the enlargement process breaking down and separating into strands.

---

[9] ORS 10.095(8) directs that such an instruction be given "on all proper occasions."

[10] Senco's warnings expressly instructed users not to so modify the SN325.

The particular point of dispute underlying the "stronger and more satisfactory" evidence instructions was plaintiffs' failure, or inability, to produce the negatives (as opposed to the prints) of the pictures Reichow took. One of defendant's experts testified that he would have obtained more clarity and information as to the "thread" or "wire" from a negative than from a print. Reichow testified that he gave both the prints and the negatives to Ann Marie Lakin's mother, Ann Armstrong. Armstrong, in turn, testified that she gave the prints to the Lakin family; that she could not remember whether Reichow had given her any negatives; and that, if he had done so, she would have given them to the Lakin family along with the prints. Both Armstrong and the Lakins have moved since the accident, and Ann Marie Lakin testified that she had searched diligently but had not been able to find any negatives.

■ On these facts, we conclude that the trial court did not abuse its discretion in declining to give the disputed instructions. As we explained in *Whaley v. Russell Stover*, 44 Or App 541, 543-44, 606 P2d 667 (1980):

> "This statutory instruction need not be given routinely merely because it is requested. * * * The party requesting the instruction *must show, and the court must find, that other evidence was reasonably available* on a fact in issue and that there is a basis for the jury to conclude the other evidence is stronger and more satisfactory than the evidence offered. *Where the question as to the propriety of the instruction is close, we defer to the trial court judge and reverse only where there is a clear abuse of discretion.*" (Citations omitted; emphasis supplied.)

*See also State v. McDonnell*, 313 Or 478, 837 P2d 941 (1992). Here, there was a factual dispute about whether the negatives were "reasonably available" to plaintiffs—*i.e.*, whether the Lakins ever actually possessed the negatives, much less at the time of requested production or trial—and the court was entitled to resolve that foundational dispute in plaintiffs' favor. The court did not err.

Defendant's sixth assignment of error asserts that the trial court erred in giving plaintiffs' special requested instruction No. 20, which provided:

"[Defendant] has alleged that plaintiff John Lakin was at fault and was a cause of his injuries by *misusing* the product.

"A manufacturer of products is required to protect against all reasonably foreseeable uses of the product. A *misuse* is one which the manufacturer could not reasonably foresee.

"In order to establish a defense based on *misuse* the [defendant] must prove by preponderance of the evidence that plaintiff John Lakin used or handled the product in a manner so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it and, therefore, a manufacturer could not have foreseen the use." (Emphasis supplied.)

Defendant claims that that instruction erroneously combined elements of the defenses of misuse, which is a comparative fault defense, and alteration, which is a complete defense to a products liability action. Consequently, defendant argues, "[i]t told the jury that if they found plaintiff had disabled the safety, and if this was a use that was reasonably foreseeable to [defendant], then [defendant] will have failed to prove '*a defense* based on misuse.' " (Emphasis in original.)

■ ■ Defendant's argument lacks merit. We consider instructions as a whole, giving them their common-sense meaning. *Anderson v. White*, 264 Or 607, 611, 506 P2d 690 (1973); *Storla v. S., P. & S. Trans. Co.*, 136 Or 315, 326, 297 P 367, 298 P 1065 (1931). Special instruction No. 20, which was drawn from *Findlay v. Copeland Lumber Co.*, 265 Or 300, 304-05, 509 P2d 28 (1973), explicitly concerned "misuse" and did not refer to "alteration." It was fully consistent with the court's other, indisputably correct, instructions, which separately addressed "misuse" and "alteration." There was no error.

Defendant's seventh assignment asserts that the trial court erred in denying Senco's pretrial motion to exclude evidence of subsequent remedial repairs or "post-accident conduct" until after the jury had determined compensatory liability. Defendant asserted that such evidence was relevant, if at all, only to punitive liability and that it would impermissibly skew the jury's deliberations on compensatory

liability. The trial court denied that motion after having twice previously denied defendant's motions to bifurcate liability and damages.

■ The short answer to this assignment, which plaintiffs advance, is that (1) defendant has not assigned error to the trial court's antecedent denials of defendant's motions to bifurcate; and (2) the presentation of "subsequent remedial" measures/"post-accident conduct" evidence before an express determination of compensatory liability was the inevitable byproduct of those predicate rulings. We agree. The trial court's denial of defendant's *in limine* motion was consistent with—and, indeed, compelled by—its denials of bifurcation. Because the evidence was relevant in the context of an unbifurcated trial, the former was error only if the latter were. Because defendant does not assign error to the court's denials of bifurcation,[11] we assume that those predicate rulings were correct. We note, moreover, that defendant did not request a limiting instruction, directing the jury to consider subsequent remedial repair/post-accident conduct evidence only with respect to punitive liability. Consequently, we conclude that the court did not err in denying defendant's pretrial motion.

## ENTITLEMENT TO PUNITIVE DAMAGES

Defendant's assignments of error eight through 13 challenge rulings pertaining to plaintiffs' asserted entitlement to punitive damages, including evidentiary rulings and the trial court's denials of defendant's motions for a directed verdict and for judgment *n.o.v.* on issues of entitlement. For ease of analysis, we first consider assignments of error 11, 12, and 13, which concern the trial court's evidentiary rulings, before turning to the broader issues of evidentiary sufficiency presented by defendant's remaining assignments. That is, before we assess whether the evidence was sufficient to support any award of punitive damages, we first consider what the record evidence was, or properly should have been.

---

[11] Those rulings, if assigned as error, would have been reviewed for abuse of discretion. *See Bremner v. Charles*, 312 Or 274, 278, 821 P2d 1080 (1991) (trial court is granted "broad discretion" in ruling on bifurcation).

Defendant's eleventh assignment of error challenges the trial court's exclusion of the testimony of Joseph Stanley. Stanley, an employee of Paslode, one of defendant's competitors, would have testified about defendant's reputation for safety in the industry. Defendant argued that such "character" evidence was admissible under OEC 404(1). That rule, provides, in part:

"(1) Evidence of a person's character or trait of character is admissible when it is an essential element of a charge, claim or defense.

"(2) Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion[.]"

In particular, defendant asserted that Stanley's testimony should have been admitted because proof of defendant's purported commitment to safety was relevant to disproving "wanton disregard for the health, safety, and welfare of others," *former* ORS 30.925,[12] an "essential element" of plaintiffs' asserted entitlement to punitive damages.

Plaintiffs countered that defendant's general "character" with respect to safety, or lack thereof, was not an "essential element" of their punitive damages claim. Rather, plaintiffs argued, "wanton disregard" related to what defendant *did* with respect to the SN325, and what it knew at the time it acted—and not to some more general notion of corporate "character." The trial court agreed, and we review its

---

[12] *Former* ORS 30.925(1) provided:

"In a product liability civil action, punitive damages shall not be recoverable unless it is proven by clear and convincing evidence that the party against whom punitive damages is sought has shown wanton disregard for the health, safety, and welfare of others."

In 1995, ORS 30.925(1) was amended to provide:

"In a product liability civil action, punitive damages shall not be recoverable except as provided in ORS 18.537." Or Laws 1995, ch 688, § 4.

ORS 18.537, which was enacted in 1995, provides, in part:

"(1) Punitive damages are not recoverable in a civil action unless it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

ruling for an abuse of discretion. *State v. Reeder*, 137 Or App 421, 425, 904 P2d 644 (1995).

■ We conclude that the trial court did not err in excluding Stanley's testimony regarding defendant's general reputation for safety. Defendant's "character" or "reputation" for safety was not an "essential element" of plaintiffs' punitive damages claim or a defense to that claim. OEC 404(1). That claim, as delimited by the pleadings, pertained to defendant's particular *conduct* with respect to a particular product, the SN325. Defendant, by offering evidence of its general reputation for safety, attempted to demonstrate that it "acted in conformity therewith" with respect to the "particular occasion" of designing, developing, and marketing the SN325. OEC 404(2). That is precisely what OEC 404(2) precludes. The trial court did not err. *Accord Mason v. Texaco, Inc.*, 741 F Supp 1472, 1504 (D Kan 1990), *aff'd and rem'd* 948 F2d 1546 (10th Cir 1991), *cert den* 504 US 910, 112 S Ct 1941, 118 L Ed 2d 547 (1992) (applying FRE 404(a): "Texaco has been sued in this case only for its conduct with respect to the product benzene, and that conduct may not be established by using character evidence circumstantially for the purpose of proving action in conformity with that character on a particular occasion.").

■ Defendant's twelfth assignment of error asserts that the trial court should have admitted Stanley's testimony describing Paslode's experience with the so-called "restrictive trigger" nail gun. Stanley would have testified that Paslode sold its nail guns in two forms—*i.e.*, with a restrictive trigger, which eliminated the gun's ability to double fire and "bump fire," or without the restrictive trigger—and that "almost all" of Paslode's customers preferred the nonrestrictive trigger tool because it "satisfies the need for productivity." Defendant argues:

> "One of plaintiff's primary theories was that Senco was strictly liable because it manufactured and sold the SN325 as a bottom fire nail gun, without disclosing a safer nail gun—the restrictive trigger fire nail gun—was available. Stanley's testimony about the type of nail guns usually sold by Paslode bears directly on the question whether Senco was acting in bad faith or with wanton disregard for others'

safety when it continued to sell the bottom fire nail gun despite the availability of a restrictive trigger nail gun."

■ The trial court determined that the testimony was irrelevant, OEC 401,[13] because Stanley's testimony pertained to Paslode's, not defendant's, market experience. We agree. There is nothing in Stanley's offer of proof that related Paslode's market experience to Senco's; nor is there evidence that Senco was even aware of Paslode's market experience. The trial court did not err in refusing to admit the testimony.[14]

■ Defendant's thirteenth, and final evidentiary, assignment of error asserts that the trial court erroneously excluded a videotape of defendant's assembly process that showed tools being assembled and tested before shipment. At trial, defendant argued that the videotape was relevant to show the manufacturing process and the care with which the tools were assembled, inspected, and tested before shipment. The trial court ruled that the tape was not relevant because, although it might show care in the manufacturing process, plaintiffs alleged a design defect, not a manufacturing defect. Moreover, although the tape depicted post-manufacturing testing (*i.e.*, to determine whether the guns were functioning as they were designed to operate), that was irrelevant to plaintiffs' "failure to test" allegations, which pertained to defendant's failure to discover the SN325's alleged inherently dangerous propensities. *See* 144 Or App at 56 n 2. In so ruling, the court observed:

> "[H]ow does that become relevant to the jury insofar as the issue on testing? It's not whether it was test fired on the assembly line but whether or not there were any tests that were performed prior to the manufacturing of the line of nailers. That's where the allegations assert that there were

---

[13] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[14] Defendant asserts, and plaintiffs do not dispute, that the trial court's evidentiary rulings should be reviewed for abuse of discretion. We note, however, that we review rulings on relevance "for errors of law." *Dyer v. R. E. Christiansen Trucking, Inc.*, 118 Or App 320, 323, 848 P2d 104 (1993), *rev'd on other grounds* 318 Or 391, 868 P2d 1325 (1994).

no tests. No one is contending that there was anything improper in the actual manufacturing process."

Again, we agree with the trial court. Whether defendant showed care in the manufacturing process and tested completed SN325s to determine that they operated as designed was irrelevant to plaintiffs' allegations of defective design and inadequate design-related research and testing, which, ultimately, underlay their claim of "wanton disregard."

We turn now to defendant's assignments of error regarding plaintiffs' general entitlement to punitive damages, including the sufficiency of proof of "wanton disregard," within the meaning of *former* ORS 30.925(1). That statute provided, in part:

> "In a product liability civil action, punitive damages shall not be recoverable unless it is proven by clear and convincing evidence that the party against whom punitive damages is sought has shown wanton disregard for the health, safety and welfare of others."

Defendant's ninth assignment of error challenges the denial of its motion for a directed verdict against plaintiffs' punitive damages claim. In considering that assignment, we review the record in the light most favorable to plaintiffs to determine if the record discloses that "plaintiff[s] presented evidence that permitted a juror to conclude, by clear and convincing evidence, that defendant acted with wanton disregard for the health and safety of others."[15] *Oberg v. Honda Motor Co.*, 320 Or 544, 553, 888 P2d 8 (1995), *cert den* ___ US ___ , 116 S Ct 1847, 134 L Ed 2d 948 (1996). *Accord Onita Pacific Corp.*, 122 Or App at 457 ("It is not our job to decide whether the evidence is clear and convincing, but to decide whether a jury could find that it is.").[16] To be clear and convincing,

---

[15] Defendant contends that, in assessing the sufficiency of evidence for purposes of *former* ORS 30.925, we must evaluate the evidence submitted by both sides "in context." That approach directly conflicts with *Oberg*'s express and implicit focus on *plaintiffs' prima facie* proof. *Accord Onita Pacific Corp. v. Trustees of Bronson*, 122 Or App 452, 457, 858 P2d 453, *rev den* 318 Or 170 (1993) (court is to review sufficiency of evidence of punitive damages "in the light most favorable to the [prevailing party]").

[16] The parties agree that we should review the "clear and convincing" sufficiency of evidence pertaining to entitlement to punitive damages under the standard expressed in *Onita Pacific Corp.* That is, rather than determining whether there is *any* evidence to support the verdict, *see, e.g., Brown v. J. C. Penney Co.*, 297

" 'the evidence must be free from confusion, fully intelligible, distinct and establish to the jury that the defendant [acted in wanton disregard for the health and safety of others]. To be both clear and convincing, the truth of the facts asserted must be highly probable.' " *Onita Pacific Corp.*, 122 Or App at 457 (quoting *Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 407, 737 P2d 595 (1987)).

■ We conclude that the record discloses clear and convincing evidence sufficient to establish plaintiffs' entitlement to some award of punitive damages. From the evidence, reasonable jurors could find that the following propositions were "highly probable":

(1) Defendant had long been aware of the tendency of its nail guns to double fire. Nevertheless, it conducted no tests to determine when, or how frequently, double firing occurred, or the extent of injury that could result from double firing.

(2) If defendant had undertaken tests relating to the SN325's propensity to double fire, it would have known of the gun's potential to seriously injure users and could have changed its warnings or the design of the gun accordingly. We note, particularly, that defendant's own expert testified that defendant did not test its "safety warning" regarding double firing to ensure that the warning accurately instructed users regarding the appropriate means of avoiding double firing. Moreover, plaintiffs' experts testified that, in their testing of the SN325, they not only found that double firing occurred frequently, but also found that the recoil effects included the same type of inadvertent "bump fire" actuation that occurred with John Lakin.

Or 695, 705, 688 P2d 811 (1984); *Hall v. Gordon*, 284 Or 49, 51, 584 P2d 1374 (1978), we should determine whether there is any evidence from which the jury could have found "wanton disregard" by clear and convincing evidence. We note that *Onita Pacific Corp.* is not necessarily consistent with other authority addressing our standard of review for claims requiring proof by "clear and convincing" evidence. *See, e.g., Faber v. Asplundh Tree Expert Co.*, 106 Or App 601, 606, 810 P2d 384 ("The clear and convincing evidence standard relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts."), *rev den* 312 Or 80 (1991). However, because we conclude that the proof was sufficient under *either* standard of review to establish plaintiffs' entitlement to punitive damages, we need not resolve which standard is the proper one.

(3) Both the SN325's design and its warnings could reasonably and practicably have been modified to make the gun's use safer. For example, the "anti-recoil" warning, 144 Or App at 60, could easily have been modified and corrected. Moreover, although defendant had manufactured a "restrictive trigger" modification of the SN325 that would eliminate the gun's ability to double fire, it did little to apprise users of the restrictive trigger or its safety purpose. In particular, although the "tool use" section of the SN325's manual noted that the restrictive trigger was useful when place firing, the manual did not inform consumers that the restrictive trigger would protect against the danger of double fire.

(4) Defendant's failure to effectively address the SN325's double firing problem was conscious and was motivated, at least in part, by a profit motive. The evidence disclosed that defendant earned substantial profits from the sale of nails used in its products[17] and that the waste of nails from double firing—the SN325 double-fired once in every 15 firings—generated additional sales for defendant. Indeed, the most prevalent complaint about double-firing from users of the SN325 was the resultant waste of nails. Thus, defendant generated greater profits by failing to address and remedy the double-fire defect. Moreover, defendant rushed the SN325's production in order to maintain its position in the market, modifying an existing nail gun model so that it could shoot longer nails, without engaging in additional testing to

---

[17] Indeed, plaintiffs presented evidence that as between the SN325 and the nails sold for use in the SN325, the sale of the nails was a significantly greater source of defendant's gross profits than the sale of the guns:

| Year | Gross Profits from SN325 Sales | Gross Profits from Sale of SN325 Nails |
|------|-------------------------------|----------------------------------------|
| 1989 | $ 505,028 | $11,817,991 |
| 1990 | $1,022,162 | $10,422,454 |
| 1991 | $1,089,075 | $10,543,667 |
| 1992 | $2,844,190 | $10,938,360 |
| 1993 | $3,179,746 | 11,362,006 |
| 1994 | $1,942,252 | $ 7,504,866 |

determine whether the use of longer nails in that model would increase the prevalence of double fire. Again, a reasonable juror could plausibly infer that conscious profit/market share motives underlay the failure to engage in adequate product research, development, and testing.

From those facts, the jury could reasonably determine that defendant, in producing and marketing the SN325 had engaged in conduct that "is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others." *Andor v. United Air Lines*, 303 Or 505, 517, 739 P2d 18 (1987). Accordingly, the trial court did not err in denying defendant's motion for a directed verdict against plaintiffs' claim for punitive damages.

Our disposition of defendant's ninth assignment of error similarly controls its parallel tenth assignment of error, which challenged the court's denial of defendant's motion for judgment notwithstanding the verdict based on the alleged inadequacy of proof of wanton disregard warranting a recovery of punitive damages. Finally and similarly, our disposition of defendant's ninth assignment of error controls the eighth assignment—*i.e.*, that the trial court erroneously permitted plaintiffs to present evidence of defendant's net worth ($82,076,000) when no *prima facie* showing of punitive liability had been made. *Former* ORS 41.315 (*repealed by* Or Laws 1995, ch 688, § 6).[18] Because plaintiffs made the requisite *prima facie* showing, there was no error.

## "EXCESSIVENESS" OF PUNITIVE DAMAGES

Defendant's fourteenth and fifteenth assignments of error challenge, respectively, the denial of its motions for judgment notwithstanding the verdict or, alternatively, for a new trial, on punitive damages, because the jury's $4 million award was, allegedly, unconstitutionally "standardless" and "excessive." In its memorandum in support of those post-trial motions, defendant asserted that the jury's award "violated the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States because it was the product

---

[18] *Former* ORS 41.315(2) provided that "evidence of the financial condition of a party shall not be admitted until the party seeking such damages has presented evidence sufficient to justify to the court a *prima facie* claim of punitive damages."

of standardless discretion by the jury" and was "excessive and disproportionate" because the award was not "subject to comprehensive post-verdict trial and appellate court review." On appeal, and in the wake of *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994), defendant does not contest the constitutional sufficiency of Oregon's procedures for assessing and reviewing punitive damages awards. Instead, defendant argues that, under *Oberg*'s review methodology, 320 Or at 544, and, particularly, under a rational application of the factors set out in ORS 30.925, the jury's award was unconstitutionally excessive.[19]

■ *Oberg* holds that, in reviewing the amount of punitive damages awarded, we are not to disturb the award when it is

"within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue." *Id.* at 544.

ORS 30.925(2) defines the statutory factors to be considered in assessing punitive damages in product liability cases:

"(2) Punitive damages, if any, shall be determined and awarded based upon the following criteria:

---

[19] Plaintiffs contend that defendant did not preserve the issue of the alleged excessiveness of a $4 million punitive damages award because it first raised its excessiveness challenge via post-verdict motions. Invoking familiar procedural principles, plaintiffs assert that defendant's present argument is nothing more than a challenge to the sufficiency of the evidence to support a $4 million award and that, as with any other "insufficiency of the evidence" challenge, that argument had to be raised by a motion for directed verdict or be forever waived.

Defendant responds by characterizing plaintiffs' nonpreservation argument as "preposterous": "How could [defendant] move for a directed verdict on the grounds the award was excessive under constitutional standards when the jury had not yet awarded punitive damages?"

Whatever the ostensible merits of the parties' contending positions, we note that the procedural posture of this case parallels that of *Oberg*, where Honda, like defendant here, first challenged the alleged excessiveness of the punitive damages award through a motion for new trial under ORCP 64 B(5). 320 Or at 552 n 9. Given the Supreme Court's review of the excessiveness issue in *Oberg*, we assume that defendant's post-trial motions were sufficient to preserve that issue for our review.

"(a) The likelihood at the time that serious harm would arise from the defendant's misconduct;

"(b) The degree of the defendant's awareness of that likelihood;

"(c) The profitability of the defendant's misconduct;

"(d) The duration of the defendant's misconduct and any concealment of it;

"(e) The attitude and conduct of the defendant upon discovery of the misconduct;

"(f) The financial condition of the defendant; and

"(g) The total deterrent effect of other punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, punitive damage awards to persons in situations similar to the claimant's and the severity of criminal penalties to which the defendant has been or may be subjected."

■ Referring to those factors, and after reviewing the entire record, we conclude that the amount of damages awarded was "within the range that a rational juror would be entitled to award." 320 Or at 544. Although we will not engage in an extensive recapitulation of the evidence, the following matters, which a jury could have found to be established by clear and convincing evidence, were especially pertinent to our review: Defendant knew—and had known for over 20 years—of its nail guns' propensity to "double fire," as well as its capacity for inadvertent "bump fire" actuation. Months before John Lakin's injury, defendant knew from numerous complaints that it was highly probable that the SN325 would "double fire." Thus, it was foreseeable—indeed, highly likely given the SN325's recoil and "bump fire" potential—that serious injury could occur to someone when the nail gun double fired. ORS 30.295(3)(a), (b). Nevertheless, defendant continued to sell the SN325 without adequately warning of its risks or adequately informing consumers of the availability and safety advantage of a "restrictive trigger" alternative. There was, moreover, credible evidence that defendant profited from additional nail sales generated from the SN325's propensity to double fire, and also profited from

its decision to rush production of the SN325, sacrificing adequate testing of the product. ORS 30.295(3)(c). Finally, the evidence indicates that defendant had a net liquidation value of $82,076,000. The $4 million punitive damages award equals approximately five percent of defendant's net value. ORS 30.925(3)(f).

In the light of the evidence pertaining to the statutory factors, and given the jury's award of approximately $6.2 million in compensatory damages, we cannot say that a $4 million punitive damages award is outside "the range that a rational juror would be entitled to award" in this case. *Oberg*, 320 Or at 544. *Compare, e.g., id.* at 555 (affirming award of punitive damages five times greater than compensatory damages). The award of punitive damages was not unconstitutionally excessive.

## APPLICATION OF ORS 18.560

Defendant's final two assignments of error, and plaintiffs' first two assignments of error on cross-appeal, challenge various rulings applying ORS 18.560, which places a $500,000 cap on the recovery of "noneconomic damages" in personal injury actions. Defendant's sixteenth and seventeenth assignments assert that the trial court erred in denying defendant's objections to the proposed judgment and its motion for judgment notwithstanding the verdict, both of which sought to limit plaintiffs' *combined* recovery of noneconomic damages to $500,000. The trial court ruled, instead, that *each* plaintiff's individual recovery of noneconomic damages could not exceed $500,000.

Plaintiffs' first assignment of error asserts that the court erred in applying ORS 18.560 to reduce their recovery, because that application was unconstitutional. Plaintiffs' second assignment of error asserts, in the alternative, that, even if ORS 18.560 can be applied constitutionally in this case, the court erred in first limiting their noneconomic damages recovery to $500,000 each and then further reducing that recovery by John Lakin's five percent comparative fault (resulting in recovery of $475,000 each), rather than first making the comparative fault reduction and then applying the statutory cap (which would have yielded recoveries of $500,000 each). If plaintiffs' first, constitutional assignment

of error is correct, *i.e.*, if application of the cap in this case was unconstitutional, defendant's sixteenth and seventeenth assignments of error necessarily fail, and plaintiffs' second assignment of error is moot. Consequently, we turn to plaintiffs' constitutional challenge.

ORS 18.560 provides, in part:

"(1) [I]n any civil action seeking damages arising out of bodily injury, including emotional injury or distress, death or property damage of any one person including claims for loss of care, comfort, companionship and society and loss of consortium, the amount awarded for noneconomic damages shall not exceed $500,000.

"(2) As used in this section:

"* * * * *

"(b) 'Noneconomic damages' means subjective, nonmonetary losses, including but not limited to pain, mental suffering, emotional distress, humiliation, injury to reputation, loss of care, comfort, companionship and society, loss of consortium, inconvenience and interference with normal and usual activities apart from gainful employment."

In *Tenold v. Weyerhaeuser Co.*, 127 Or App 511, 873 P2d 413 (1994), *rev dismissed* 321 Or 561, 901 P2d 859 (1995), we concluded that ORS 18.560 was unconstitutional because it violated Article VII (Amended), section 3, of the Oregon Constitution. That section provides, in part:

"In actions at law, where the value in controversy shall exceed $200, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless the court can affirmatively say there is no evidence to support the verdict."

In *Tenold*, the defendant appealed from a jury verdict awarding the plaintiff $900,000 in noneconomic damages for claims of malicious prosecution, intentional infliction of severe emotional distress, and defamation. We held that the jury's verdict on damages is a "fact tried by a jury" and that applying ORS 18.560 offended Article VII (Amended), section 3, because it compelled the court to "nullify the jury's factual

determination to the extent that it exceeds the [statute's] damage cap." *Id.* at 525.

Defendant argues that *Tenold* was wrongly decided and that, in all events, it has been implicitly overruled by *Greist v. Phillips*, 322 Or 281, 906 P2d 789 (1995), in which the court held that ORS 18.560 may be applied in a statutory wrongful death action without violating Article VII (Amended), section 3. We disagree. The court in *Greist* carefully and specifically limited its analysis of the constitutionality of ORS 18.560 under Article VII (Amended), section 3, to "wholly statutory" rights of action. *Id.* at 296-97. Because the wrongful death claim at issue there was wholly statutory, the legislature's limitation on noneconomic damages recoverable on that claim did not run afoul of Article VII (Amended), section 3. *Id.* at 296 ("Nothing in the wording of Article VII (Amended), section 3 * * * restricts the legislature's authority to set a substantive limitation on a purely statutory remedy.").

This case, like *Tenold*, involves common-law rights of action, *e.g.*, negligence and loss of consortium or, in the case of the strict liability claim, a right of action now clothed in statutory garb, but with common-law origins. Because *Greist*, by its terms, applies only to wholly statutory actions without common-law underpinnings, we adhere, in this case, to *Tenold*. Consequently, the trial court erred in applying ORS 18.560 to reduce plaintiffs' recovery of noneconomic damages.

## LOSS OF CONSORTIUM/COMPARATIVE FAULT

In plaintiffs' third, and final, cross-appeal assignment of error, Ann Marie Lakin challenges the trial court's reduction of her loss of consortium recovery against defendant by the five percent comparative fault the jury allocated to John Lakin. She contends that ORS 18.470, Oregon's comparative fault statute, does not apply, because her action is independent from her husband's and, thus, not subject to the same defenses and offsets. Defendant responds that, because the legislative history of ORS 18.470 indicates that that statute was derived from Wisconsin's comparative fault statute, Wisconsin law is instructive. Under Wisconsin law, an injured spouse's negligence either reduces or bars recovery

on the other spouse's loss of consortium claim. *See, e.g., White v. Lunder*, 66 Wis 2d 563, 225 NW2d 442 (1975).[20]

ORS 18.470 provides:

> "Contributory negligence shall not bar recovery in an action by any person or the legal representative of the person to recover damages for death or injury to person or property if the fault attributable to the person seeking recovery was not greater than the combined fault of the person or persons against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the percentage of fault attributable to the person recovering. This section is not intended to create or abolish any defense."[21]

The first sentence of the statute speaks of comparing "the fault *attributable* to the person seeking recovery" against that of the person(s) "against whom recovery is sought." (Emphasis supplied.) Ann Marie Lakin, "the person seeking recovery" for loss of consortium, had no direct or personal "fault" with respect to the underlying accident; however, neither the text nor context of the statute clarifies the circumstances, if any, under which the fault of another is "attributable" to a plaintiff. The statute proceeds to state that it is "not intended to create or abolish any defense." The unambiguous import of that language, adopted in 1975,[22] is that preexisting defenses were not altered by virtue of the shift from contributory negligence to comparative fault. Thus, we must

---

[20] Oregon courts have consistently endorsed the proposition that, when the legislature "borrows a statute from another state, the interpretation of the borrowed statute by the courts of the earlier enacting state ordinarily is persuasive." *State ex rel Western Seed v. Campbell*, 250 Or 262, 270-71, 442 P2d 215 (1968), *cert den* 393 US 1093, 89 S Ct 862, 21 L Ed 2d 784 (1969). *Accord Fleischhauer v. Bilstad et al, Gray et ux*, 233 Or 578, 585, 379 P2d 880 (1963) (noting "presumption" that legislature intended to adopt "the construction * * * placed upon the statute by the highest court of [the originally enacting] state."); *State v. Sallinger*, 11 Or App 592, 597, 504 P2d 1383 (1972) ("presumption" applies "absent any indication to the contrary"). Although repeatedly asserted, the practical premise of the proposition—*i.e.*, that the legislature is aware of the case law of other jurisdictions (much less endorses the particulars of those decisions)—may warrant closer examination. *Cf.* Jack Landau, *Some Observations About Statutory Construction in Oregon*, 32 Will L Rev 1, 19-20 (1996) (presumption of "legislative acquiescence" in judicial interpretations of statutes "simply does not accord with reality").

[21] ORS 18.470 has since been amended, Or Laws 1995, ch 696, § 3. However, the portion of the statute that is pertinent to this case has not changed.

[22] Or Laws 1975, ch 599, § 1.

determine whether, before the enactment of ORS 18.470, persons who sued for loss of consortium were subject to defenses or offsets based on the spouse's conduct.

 Under Oregon common law, a spouse's loss of consortium action "is measured by and subject to any defenses available in [the other spouse's] action for redress of the same harm." *Ross v. Cuthbert*, 239 Or 429, 432, 397 P2d 529 (1965).[23] In *Ross*, the court held that an injured spouse's contributory negligence was a valid defense to the other spouse's loss of consortium claim. In so holding, the court emphasized that

"[s]ymmetry in the law or, termed otherwise, logical consistency is, of course, highly desirable; but of paramount importance is justice. It is apparent that the courts do not believe that a [spouse] should be permitted to recover if [the other spouse's] injuries were the result in part of [his or her fault]." *Id.* at 434.

Thus, at the time ORS 18.470 was enacted, Oregon law recognized that one spouse's fault was a defense to the other spouse's recovery for loss of consortium. ORS 18.470 did not abolish that defense. Consequently, the trial court did not err in reducing Ann Marie Lakin's loss of consortium recovery by five percent.

Given our disposition of the cross-appeal, we remand for entry of a modified judgment, awarding plaintiff John Lakin noneconomic damages of $1,900,000 and awarding plaintiff Ann Marie Lakin loss of consortium damages of $832,200.

On appeal, affirmed; on cross-appeal, reversed and remanded for entry of judgment modifying plaintiff John Lakin's recovery of noneconomic damages and plaintiff Ann Marie Lakin's recovery for loss of consortium and otherwise affirmed.

---

[23] *See also Ellis v. Fallert et al*, 209 Or 406, 307 P2d 283 (1957) (the exclusivity provision of the workers' compensation laws also precluded spouse's loss of consortium claim). *But see Naber v. Thompson*, 274 Or 309, 312, 546 P2d 467 (1976) (guest statute did not bar loss of consortium claim, even though statute barred the other spouse's personal injury claim).